IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JEFFERY L. NICHOLS and
PATRICIA L. NICHOLS,

          Plaintiffs,

v.                              CIVIL  ACTION  NO.  3:11-0535

SPRINGLEAF HOME EQUITY
INC., fka American General Home
Equity, Inc., a non-resident corporation,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

      Pending is Defendant Springleaf Home Equity, Inc.'s, Motion to Compel Arbitration and Stay all Further Judicial Proceedings (ECF No. 3). In an order dated November 8, 2011 (ECF No. 35), the Court ordered a limited period of additional discovery on one issue: whether the loan contract between Plaintiffs and Defendant was a validly-formed contract. Briefing on this issue is now complete. For the reasons given below, the Court **GRANTS** Defendant's Motion.

**I.  Facts**

      Plaintiffs' Complaint puts forth a series of claims based on Defendant's conduct at various points during the life of a loan made by Defendant to Plaintiffs in early 2002. Complaint, ECF No. 1, Ex. 1. However, for the purposes of the present determination, the Court need only consider the circumstances surrounding the formation of the loan agreement, and therefore recites only those facts.

On October 3, 2002, Plaintiffs Patricia and Jeffrey Nichols went to the retail office of American General Home Equity (now Defendant Springleaf Home Equity) at the Eastern Heights shopping center in Huntington, West Virginia. Pls.' Supp. Br., ECF No. 47, at 2-4. There, they completed a transaction for a secured real estate loan. *Id.* Plaintiff Jeffrey Nichols had been in contact with branch manager Kevin Brown regarding the loan before the closing transaction, but conducted the closing with Kevin Chattin, a loan representative. *Id.* The Nichols signed a five-page loan contract, which included two pages specifying the arbitration procedures to be used in any dispute regarding the loan, and initialed each page. ECF No. 13, Ex. 4, at 4-5 ("Contract"). The agreement provided the Nichols with about $62,000 in exchange for interest in two parcels of real estate, 1701 and 1707 Monroe Avenue, Kyle District, Cabell County, West Virginia.[1] *Id.*

More than nine years after the loan closing, Plaintiffs filed this action, seeking redress for Defendant's activities in making and administering the loan, including Defendant's actions when Plaintiffs went into default on the loan at some point around early 2011. ECF No. 1, Ex. 1 ("Complaint"). Defendant filed a motion to stay and compel arbitration (ECF No. 3), arguing that all disputes regarding the loan are subject to arbitration rather than litigation, as specified in the Contract. Defendant argues that the agreement to arbitrate is valid and enforceable under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq* ("FAA").

The Contract contains two pages detailing the arbitration obligations each party undertakes as part of the Contract. The arbitration section of the Contract begins: "TO THE FULLEST EXTENT PERMITTED BY LAW, BY SIGNING THIS AGREEMENT, BOTH LENDER AND I ARE VOLUNTARILY WAIVING ANY RIGHT TO A JURY TRIAL OR JUDGE TRIAL OF

---

[1] The exact property interest held by Plaintiffs before the loan transaction is contested.

ALL CLAIMS AND DISPUTES COVERED BY THIS ARBITRATION AGREEMENT." (bolding omitted). The arbitration obligation covers "all disputes between the parties, which includes but is not limited to, all claims and disputes arising out of, in connection with, or relating to [various activities surrounding the lending and property ownership relationships]" Contract, at 4. Notably, the agreement to arbitrate also purports to cover the questions of "*whether the dispute must be arbitrated; the validity and enforceability of this Arbitration Agreement and the Agreement, my understanding of them, or any defenses as to the validity and enforceability of the Agreement and this Arbitration Agreement. . .*" *Id.*[2] (emphasis added). The Contract also contains various warnings to its signatories that they should read the arbitration provisions closely. *See, e.g.*, Contract, at 5. The Contract also includes a notice of billing rights, and appears to be a largely unmodified form contract provided by the Defendant. Plaintiffs initialed the Contract on each page.

## II. The Federal Arbitration Act

To compel arbitration, a party must demonstrate that the parties agreed to arbitrate the dispute.[3] The question is thus whether the agreement to arbitrate in the Contract between Plaintiffs and Defendant, which purports to cover all disputes related to the Contract, is valid and enforceable.

---

[2] Although Plaintiffs have not pressed the issue, the Court concludes that this language meets the "clear and unmistakable" standard of *Carson v. Giant Food, Inc.*, 175 F.3d 325, 239 (4th Cir. 1999), which would require, in this case, that the parties explicitly agree to arbitrate arbitrability. *See Peabody Holding Co., LLC v. United Mine Workers Intern. Union*, 665 F.3d 96, 102 (4th Cir. 2012).

[3] *See Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991) ("To state a claim to compel arbitration under the FAA, a plaintiff must allege (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.")

If so, the Court must compel arbitration. A district court "has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir.2002).

Interpretation of the Contract in this case is governed by the Federal Arbitration Act ("FAA"), which provides a "body of federal substantive law of arbitrability applicable to any arbitration agreement within the scope of the Act." Def.'s Mot. at 5 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp*, 460 U.S. 1, 24 (1983)). Under the FAA, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1470, 1475 (2010) (internal citations omitted).

A Court's consideration of an agreement to arbitrate is limited when, as in this case, an arbitration agreement provides that the "gateway" question of whether the contract is arbitrable must itself be submitted to arbitration. In *Rent-A-Center West v. Jackson*, the Supreme Court held that these gateway provisions must be enforced, and arbitration directed, when the plaintiff challenges the enforceability of the contract as a whole—by alleging that the contract's terms are unconscionable, for example. 130 S.Ct. 2272, 2778-79 (2010). However, where the gateway provision is itself specifically challenged, the court may decide such a challenge. *Id.* at 2778-79. In this case, the Plaintiffs have argued that the Contract is unconscionable, rather making a specific challenge to the gateway provision, and so questions of the Contract's enforceability must be decided by arbitration.

However, in *Granite Rock v. International Brotherhood of Teamsters*, decided three days after *Rent-a-Center*, the Court identified one additional area in which courts retain determination

of whether an arbitration agreement is enforceable: challenges to whether an agreement to arbitrate was validly formed. 130 S.Ct. 2847 (2010). Courts may determine this threshold issue because "[a] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock*, 130 S.Ct. at 2856 (citing *First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 943 (1995); *AT & T Tech. v. Commc'n. Workers of Am.*, 475 U.S. 643, 648-49 (1986)). Therefore, courts can decide these "formation disputes." *See Janiga v. Questar Capital Corp.*, 615 F.3d 735 (7th Cir.2010) (district court the proper forum for resolution of an initial question of formation in an arbitration contract dispute). Here, Plaintiffs argue that the Contract, including the arbitration agreement, was not validly formed, and so the Court will consider this limited issue.

### III. Contract Formation

In this matter, Plaintiffs have argued that flaws in the loan closing process prevented a contract to arbitrate from being validly formed. The Court may therefore decide the question of whether a contract to arbitrate was formed. *Granite Rock*, 130 S.Ct. At 2856.

Contract formation is a question of state law. In West Virginia, "a contract is formed when the minds of the parties meet. The writing, if unambiguous, is the indisputable evidence of the agreement." *Brown v. Woody*, 127 S.E. 325, 326-27 (W. Va. 1925). In this case, the writing is unambiguous. Nonetheless, Plaintiffs attack the contract formation, arguing that the "minds of the parties" did not meet. *Id*. Plaintiffs advance a few theories in support of this argument: first, that they were that they were rushed through signing and that they were not permitted to take home copies of the agreement; second, that the arbitration element of the agreement was not disclosed, and

that neither they nor Defendant's loan closing agent understood the arbitration agreement; and, third, that the defects in the title to one of the collateral properties prevented a true meeting of the minds.

Taking up these arguments in turn, it is evident that a contract to arbitrate was formed. Both Plaintiffs initialed each page of the Contract. Although Plaintiffs argue that they were rushed through signing or prevented from taking copies of the contract, they provide no evidence of such coercion. In fact, Plaintiff Jeffrey Nichols admits that he was not rushed into signing the Contract. Def.'s Mem. of Law on Issue of Contract Formation, ECF No. 48, Ex. A (J. Nichols Dep.), at 22. He also concedes that the Defendant's agent did not refuse him an opportunity to read the Contract. *Id*. at 42-43.

Next, Plaintiffs argue that the arbitration element of the agreement was not disclosed, but the signed documents clearly indicate that it was obvious, as it consumed two pages of the relatively short agreement. *See* Contract at 3-4. They also argue that they did not understand arbitration or the significance of the agreement, yet this argument holds no water. Where there is written evidence that the parties agreed, their knowledge is presumed. *Sedlock v. Moyle*, 668 S.E.2d 176, 180 (W. Va. 2008). Even if Plaintiffs did not read the contract, "in the absence of extraordinary circumstances, the failure to read a contract before signing it does not excuse a person from being bound by its terms." *Reddy v. Community Health Found. of Man*, 298 S.E.2d 906, 910 (W. Va. 1982). Plaintiffs show no extraordinary circumstances in this case; for better or worse, the circumstances were rather ordinary: they signed a contract they may not have fully understood and now seek to be excused from it. *See Sedlock,* 668 S.E.2d at 180 ("[i]t was his duty to know what was contained in the deeds. The law says that he shall know. If he did not read the deeds at any time before acceptance it was clearly his fault and negligence.") (quoting *Southern v. Sine*, 123 S.E.

436, 439 (W. Va. 1924)). *See also Sydnor v. Conseco Fin. Serv. Corp.,* 252 F.3d 302, 306 (4th Cir. 2001) (applying Virginia law) (failure to understand arbitration provision of a contract does not invalidate contract).

Plaintiffs also appear to argue that formation was impeded because Defendant's loan agent, Kevin Chattin, did not understand arbitration, although they provide no detail as to how his purported ignorance would have prevent formation. Plaintiffs do not allege that they sought information from Chattin that he refused or was unable to provide, nor that Chattin misrepresented the arbitration agreement during the closing. *See* ECF No. 48, Ex. A (J. Nichols Dep.), at 28 ("he had everything that we asked him to do for us."). Although Plaintiffs argue that Chattin admits he does not understand the arbitration agreement, the weight of Chattin's inability to recall the specifics of arbitration agreements is questionable: he has not worked for Defendant for many years, does not recall many details of his work for Defendant, and denies any specific recollection of Plaintiffs' loan. *See* Def.'s Mem. of Law on Issue of Contract Formation, ECF No. 48, Ex. D (K. Chattin Dep.), at 6 ("I don't recall a single closing from the time I was there."). In short, none of Plaintiffs' allegations about flaws in the contract signing process demonstrate that a contract was not formed.

Additionally, Plaintiffs' behavior after the signing indicates that a valid contract was formed– which included the agreement to arbitrate. Plaintiffs admit that they signed the Contract with the intent of exchanging some interest in their Monroe Avenue properties (the exact type of interest conveyed is disputed) in exchange for a loan of around $62,000. They used the loan funds, made payments on the loan before bankruptcy, and reaffirmed the loan after bankruptcy.[4] The loans did not go into default until sometime in 2011, so between 2002 and 2011, both Plaintiffs and Defendant

---

[4] Plaintiffs dispute the validity of the reaffirmation.

acted in some kind of reliance on the Contract; that behavior, along with the unambiguous language of the contract, is evidence that there was a meeting of the minds and that a contract was therefore formed. *Logan v. Kanawha Coal Co. , LLC v. Detherage Coal Sales*, LLC, 2:11-cv-00342, 2012 U.S. Dist. LEXIS 7206 at *25-26 (S.D.W. Va. Jan. 20, 2012) (Goodwin, C.J.) (a meeting of the minds may be evidenced by "word, act or conduct which evince the intention of the parties to contract.") (internal citations omitted).

Plaintiffs last allege that no contract was formed because the property that was the basis for the loan agreement was not correctly described on the loan contract. Pls.' Special Br. on Formation Issues, ECF No. 47, at 2. Plaintiffs essentially contend that they only had a land contract, not title, to one encumbered property, 1707 Monroe Avenue. First, such a mistake would likely be a defense to contract enforcement, which this Court cannot consider in this matter. *See Rent-a-Center*, 130 S.Ct. at 2778-79. However, even viewing this allegation as a formation dispute which this Court may consider, such a mistake would have been to Defendant's detriment, not Plaintiffs', and in any event did not impede the performance of the contract. *See, e.g.*, *Syl. Pt. 2, McGinnis v. Cayton*, 312 S.E.2d 765 (W. Va. 1984). Plaintiffs exchanged what interest they did have in the 1707 Monroe Avenue property for $62,000, and made their loan payments for some time. Eventually, they did obtain title to the property in question. Defendant's alleged mistake, if anything, benefitted the Plaintiffs by overestimating the extent of their interest in the collateral property. Without the benefit of any argument regarding how this mistake now presents a basis for assuming the contract they performed under for years was never formed in the first place, the Court concludes that it did not impede contract formation. *See Janiga*, 615 F.3d at 742 ("[N]one of these arguments refutes the

basic point that [the plaintiff] signed an agreement . . . and that the parties performed under that agreement . . . .").

In sum, Plaintiffs signed the contract and acted in accordance with it for many years, but now seek to be excused from its terms. The Contract was a validly-formed agreement to arbitrate. To the extent that Plaintiffs allege defects in the Contract under state law (e.g., unconscionable terms), these allegations relate to contract defenses rather than contract formation defects, and are, under the gateway provision, issues for the arbitrator to determine. Defendant's Motion to Compel Arbitration is **GRANTED** and Plaintiffs are directed to pursue any relief sought through arbitration as provided in the Contract. The Court further **DIRECTS** that this case be administratively closed pending such arbitration. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: March 8, 2012

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE